CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

MAR 31 2022

JULIA C. DUDLEY, CLERK
BY: s/ H. MCDONALD
      DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| MARY W.,[1] | ) | |
| Plaintiff, | ) | Civil Action No. 4:21-cv-00005 |
| | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | |
| KILOLO KIJAKAZI, | ) | By:    Joel C. Hoppe |
| Acting Commissioner of Social Security, | ) | United States Magistrate Judge |
| Defendant. | ) | |

Plaintiff Mary W. asks this Court to review the Commissioner of Social Security's final
decision denying her applications for disability insurance benefits ("DIB") and supplemental
security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401–
434, 1381–1383f. The case is before me by the parties' consent under 28 U.S.C. § 636(c). ECF
No. 14. Having considered the administrative record, the parties' filings, and the applicable law,
I cannot find that the Commissioner's denial of benefits is supported by substantial evidence.
Accordingly, the decision must be reversed and the case remanded under the fourth sentence of
42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final
decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see
also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is
limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute
[its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir.
2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the
United States has recommended that, due to significant privacy concerns in social security cases, federal
courts should refer to claimants only by their first names and last initials.

whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *accord* 20 C.F.R. §§ 404.1505(a), 416.905(a).[2] Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration

---

[2] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

Mary applied for DIB and SSI in June 2014, *see* Administrative Record ("R.") 140–45, 151–52, alleging disability because of degenerative disc disease, neck problem, fibromyalgia, high blood pressure, headaches, irritable bowel syndrome ("IBS"), and hyperhidrosis, R. 227. She alleged she became disabled on January 1, 2013. R. 140, 151, She was forty-six, or a "younger person" under the regulations, on her alleged onset date. R. 63; 20 C.F.R. §§ 404.1563(c), 416.963(c). Disability Determination Services ("DDS"), the state agency, denied her claims initially in July 2014. R. 63–80. In April 2016, Mary appeared with counsel and testified at an administrative hearing before ALJ Randy Riley. *See* R. 42–61.

ALJ Riley issued an unfavorable decision on May 4, 2016. *See* R. 777–90.[3] In October 2017, Mary filed an action in the United States District Court for the Middle District of Pennsylvania contesting that decision. R. 802–03. In April 2019, United States Magistrate Judge Gerald B. Cohn issued a report and recommendation recommending that the case be remanded to the Commissioner. R. 813–19. In September 2019, United States District Judge Yvette Kane adopted Judge Cohn's report and recommendation and remanded the case to the Commissioner.

---

[3] In September 2017, Mary filed applications for disability. R. 833. The state agency found her disabled as of May 5, 2016, and granted her benefits. *Id.*

R. 810–12. In January 2020, the Appeals Council vacated ALJ Riley's final decision and

remanded the case to another ALJ "for further proceedings consistent with the order of the

court." R. 833. In September 2020, Mary appeared with counsel and testified at an administrative

hearing before ALJ Howard K. Treblin. *See* R. 744–73. A vocational expert also testified at the

hearing. *See* R. 766–72.

ALJ Treblin issued an unfavorable decision on November 20, 2020. *See* R. 720–35. He

found that Mary had not engaged in substantial gainful activity from January 13, 2013, through

May 4, 2016. R. 723. Mary had "severe" impairments of neck disorder, back disorder,

fibromyalgia, obesity, depressive disorder, and panic disorder. *Id.* Her restless leg syndrome,

hypertension, and urinary incontinence were "non-severe," as they "did not appear to cause more

than a minimal effect on her ability to work." *Id.* None of Mary's "severe" impairments met or

medically equaled a relevant Listing. (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 1.04, 12.04,

12.06).

ALJ Treblin then evaluated Mary's residual functional capacity ("RFC") and found that

she could perform "light"[4] work with additional limitations. R. 725–26. Additional limitations

included that Mary needed the option to alternate between sitting and standing every twenty

minutes or as needed; could never climb ladders, ropes, or scaffolds, or push or pull or operate

foot controls with her bilateral lower extremities; could occasionally climb ramps or stairs,

balance, stoop, kneel, crouch, crawl, and perform rotation, flexion, and extension of her neck;

and needed to avoid all exposure to cold temperatures and workplace hazards. *Id.* Further, Mary

---

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects
weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b), 416.967(b). A person who can meet these
relatively modest lifting requirements can perform "[t]he full range of light work" only if he or she can
also "stand or walk for up to six hours per workday or sit 'most of the time with some pushing and pulling
of arm or leg controls.'" *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr.
29, 2010) (quoting 20 C.F.R. § 404.1567(b)); SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983).

"could perform simple, repetitive, routine job instructions and tasks and no fast-paced production involving only simple work-related decisions with few if any workplace changes," and she could interact appropriately with others and respond appropriately to routine work situations and changes in the workplace. R. 726.

Based on this RFC finding and the VE's testimony, ALJ Treblin found Mary could not perform her past relevant work, R. 733, but that she could perform the requirements of certain "light" jobs existing in significant numbers in the national economy, *id.*, including hand packager, inspector, and ticket checker, R. 734 (citing R. 768–71). He therefore found Mary "not disabled" from January 1, 2013, through May 4, 2016. R. 734–35. The Appeals Council did not exercise its discretion to review ALJ Treblin's decision. *See Alicia W. v. Saul*, No. 5:20cv6, 2021 WL 2366018, at *2 (W.D. Va. June 9, 2021) ("'If no exceptions are filed and the Appeals Council does not assume jurisdiction' on its own within the sixty-day period, the ALJ's hearing decision automatically 'becomes the final decision of the Commissioner after remand.'"). This appeal followed.

### III. Discussion

Mary challenges the ALJ's evaluation of the opinion evidence of record. *See generally* Pl.'s Br. 11–17. She argues the ALJ failed to weigh the RFC Questionnaire form filled out by Michael Van Grouw, P.A., in violation of the remand order issued by the Appeals Council. *Id.* at 11–14 (citing 20 C.F.R. § 404.977(b)); *see also* 20 C.F.R. § 416.1477. Next, she contends that the ALJ provided a legally deficient evaluation of the opinion of Louis Fuchs, M.D. *Id.* at 14–16. Lastly, Mary asserts that because the ALJ did not consider PA Van Grouw's RFC questionnaire and "found Dr. Fuchs' opinion was not applicable to the relevant period," he had no other

opinion to rely on and thus erroneously "insert[ed] his own lay opinion when crafting [Mary's] RFC." *Id.* at 16. Mary's second argument is persuasive.

1.    *Background*

      A.    *Relevant Medical Evidence*

In August 2012, prior to the relevant period, Mary underwent an anterior cervical spinal fusion. R. 313–16; *see also* R. 339 (noting anterior cervical surgeries in 1997 and 2000). On November 2, it was noted that Mary had "done well" with her recovery and had resumed working, but she complained of headaches and said she had a flare up a couple of weeks prior. R. 335. Examination revealed good range of motion ("ROM") in her neck "within normal limits for two cervical spinal surgeries," 5/5 strength in her upper extremities, and stable gait. *Id.* Michael Fernandez, M.D., refilled her Norco and told her she could begin increasing her work activities "as tolerated" on November 19, but to "ease off" if she experienced more discomfort. *Id.* On November 19, Mary complained of five weeks of ongoing headaches and neck pain. R. 392. On exam, she displayed pain in the occipital region of her neck with forward bending, negative Romberg's test, and good strength and coordination getting on and off the exam table. R. 393. Mary was assessed with headache, which was noted to "most likely" be intractable migraine. *Id.*

In December, five months after her surgery, Mary had a "slight" increase in neck pain, but it was noted to be "tolerable" and nonradicular. R. 1402. Examination revealed full ROM in her cervical spine, 5/5 upper extremity strength, and mild tenderness at the cervicothoracic junction off midline. *Id.* Dr. Fernandez recommended epidural steroid injections ("ESI"), refilled her Norco, and provided her with neck exercises to do at home. *Id.* In February 2013, Mary was "no longer having headaches after some therapy on her neck," R. 398, and exam findings were normal, R. 398–99.

In July, Mary complained that she had tripped and reaggravated her neck condition. R. 33. She was doing "relatively well" until the fall, but she now complained of "persistent" upper extremity numbness and tingling. *Id.* Exam showed stable gait, well-healed cervical incision, slightly diminished ROM, 5/5 upper extremity strength, negative Hoffman's, and negative Spurling's, although her Spurling's test "recreate[d] neck pain." *Id.* In September, Mary's symptoms had "improved tremendously," and exam findings were generally unchanged from July. R. 1406. An October cervical MRI showed the appearance of her spine had "somewhat improved" since her prior cervical MRI in June 2012. R. 319. Specifically, imaging showed "asymmetric bulging of the intervertebral disc at the C4/5 level compressing the right lateral aspect of the cervical cord" that was "much less pronounced" and "only mild compression on the right side of the cervical cord." *Id.*

When Mary saw Dr. Fernandez again in February 2014, she complained of "chronic" neck pain radiating into her upper extremities and some weakness. R. 331. On exam, her neck ROM was "slightly to moderately" diminished, but all other findings were normal. *Id.* Dr. Fernandez noted that Mary had tried several modalities of treatment, but he did "not think surgery would be of benefit to Mary," and he referred her to pain management for "possible further injections." *Id.* Later in February, Mary saw Ali Yousufuddin, M.D., complaining of chronic neck pain. R. 356. She described the pain as constant, dull, aching, and sometimes sharp and stabbing, and she said it was aggravated by any kind of activity and occasionally disturbed her sleep. *Id.* On exam, Mary had "marked" tenderness in the midline and left paravertebral area at C6-7. R. 358. Dr. Yousufuddin assessed chronic neck pain, cervical radiculopathy, radicular pain of the upper extremities, cervical degenerative disc disease, and status-post cervical fusion

times three. *Id.* He ordered a cervical ESI and started Mary on Tramadol, Amitriptyline, and Mobic. R. 359; *see also* R. 588.

In March, Mary rated her neck pain a four-out-of-ten and reported headaches. R. 354; *see also* R. 587. Examination revealed "marked" tenderness in her midline and left paravertebral area at C7-T1, and she "complain[ed] of increased neck pain with flexion as well as extension of her cervical spine." R. 355. Dr. Yousufuddin ordered repeated cervical ESI and told Mary to continue her medications. *Id.*; *see also* R. 352–53 (reporting 75% neck pain relief from ESI lasting for one week) (May 21, 2014). In June, Mary said her left-sided neck pain varied from a two- to a five-out-of-ten, R. 350, and exam findings were unchanged, R. 351. In July, Mary displayed "marked" tenderness in the midline and left paravertebral area at C7-T1, and she complained of increased neck pain with flexion and extension of her cervical spine. R. 583.

In September, Mary said she had hurt her back while placing her baby in a childcare seat and that she had experienced pain since. R. 577. She rated her back pain a seven- or eight-out-of-ten, and she reported numbness in her right lower extremity. *Id.* On exam, she displayed decreased sensory response to soft touch on the outer aspect of her right leg, positive straight leg raising test on the right, "marked" tenderness in the midline and right paravertebral area at L5-S1, and she "complain[ed] of increased low back pain with flexion of her lumbosacral spine." R. 578. Dr. Yousufuddin assessed low back pain, left lumbosacral radiculopathy, radicular pain of the left lower extremity, and cervical degenerative disc disease. *Id.* He scheduled Mary for lumbar ESI and increased her Trileptal dosage. *Id.*; *see also* R. 574, 576 (lumbar ESI).

In October, Mary underwent greater and lesser occipital nerve blocks and a steroid injection for her right-sided headaches. R. 573. In November, she said that the procedure afforded her 75% pain relief from her headaches, "and the pain relief from her headaches [was]

ongoing." R. 571. She also reported that her right sided low back pain was "almost 60%" improved after an ESI in October and that the pain relief was ongoing. *Id.* Examination revealed "mildly" decreased sensory response to soft touch on the outer aspect of her right leg, "some tenderness" at the midline and right paravertebral area at C7-T1, "mild tenderness" over the left paravertebral area at L5-S1, and "adequate" ROM in all directions in her lumbar and cervical spines. R. 572.

In December, Mary reported that after tripping at work in November, her right-sided headaches had returned, and her right-sided neck pain had increased. R. 569. On exam, Mary displayed "marked" tenderness over her right lesser occipital nerve, "some" tenderness over the right greater occipital nerve, and "marked" tenderness in the midline and paravertebral areas of C6-7, and she "complain[ed] of increased neck pain in th[at] area with both flexion and extension of her cervical spine." R. 570. Dr. Yousufuddin ordered cervical ESI, scheduled another nerve block procedure, prescribed Norco, and ordered a cervical MRI. *Id.* A cervical MRI performed a few days later revealed "unremarkable" cervical disc fusion at levels C4 through C7, "moderate" spinal canal stenosis at C3-C4, "mild" spinal canal stenosis at C4-C5 and C7-T1, multilevel neural foraminal stenosis "with moderate right neural foramina stenosis at the C6-C7 level, and moderate bilateral neural foramina stenosis at the C7-T1 level," but no acute pathology. R. 466.

In January 2015, Mary complained to Dr. Fernandez of thoracolumbar pain radiating to her lower extremities worse on the right. R. 449. She rated her pain a nine-out-of-ten, and she said it was exacerbated by long standing, working, or walking and improved by sitting or putting her feet up. *Id.* Lumbar exam showed her paraspinal muscles were "mildly" tender, a "slight" scoliotic curve on forward bend, near normal ROM with flexion, extension, lateral bending, and

rotation with "mild" local radiation of pain, and steady gait. *Id.* Dr. Fernandez assessed thoracolumbar scoliosis, lumbar radiculitis, and lumbar spondylosis, and he recommended a lumbar MRI. R. 450. A lumbar MRI performed a few days later showed left paracentral disc protrusion at L1-2, which was "encroaching on upon the thecal sac" and resulted in "borderline" central spinal stenosis at that level; diffuse lumbar degenerative disc disease with disc bulge, "mild to moderate in nature" at all other lumbar levels; and "mild" degenerative spondylosis and degenerative arthritis of the lumbar spine. R. 1419.

In February, Mary reported 70% pain relief after cervical ESIs at C7-T1, and she said the pain relief was ongoing. R. 565. She also complained of neck pain "at a higher level" and increased low back pain. *Id.* She said her pain was primarily on the right side and "may" radiate down her upper and lower extremities. *Id.* Her neck pain varied from three- to seven-out-of-ten, and her low back pain ranged from one- to nine-out-of-ten. *Id.* Examination revealed decreased sensation in the inner aspect of her right leg, positive straight leg raising test on the right, "marked" tenderness in the midline and right paravertebral areas at C6-7, and tenderness at the midline and right paravertebral area at L4-5, and she complained of increased neck pain at C6-7 with flexion and extension over the cervical spine and increased low back pain with flexion of her lumbosacral spine. R. 566. Dr. Yousufuddin ordered a cervical ESI and prescribed Norco and Mobic. *Id.*

In March, Mary "continue[d] to have upper/mid back pain between her shoulder blades." R. 561. On exam, she displayed "marked" tenderness in the midline and right paravertebral area at T6-7 and "some" tenderness in the right paravertebral area at T5-6, and she complained of increased upper/mid back pain with flexion of her thoracic or lumbar spine. R. 562. Dr. Yousufuddin assessed chronic upper/mid back pain, thoracic spine pain, and thoracic

degenerative disc disease, and he ordered thoracic ESI and noted that Mary was a potential candidate for a TENS unit. *Id.*

In April, Mary reported that she had recently "tripped and twisted but did not fall," she had "significant discomfort" in her neck, thoracic, and lumbar areas, and her pain occasionally radiated to her buttocks and down her legs. R. 453. A cervical exam revealed no palpable tenderness or spasms; full ROM with flexion, extension, lateral flexion, and rotation; pulling and discomfort at end range; and some tightness of the cervical musculature. *Id.* A thoracic exam demonstrated full ROM and tightness of the thoracic musculature, and Mary "[s]tate[d] she gets a pulling sensation in her thoracic area with arm abduction." R. 454. David Frank, M.D., noted no acute MRI findings, "felt that [Mary] ha[d] aggravation of pre-existing degenerative changes," told her she was a good candidate for needle acupuncture, and performed auricular acupuncture with Vaccaria seeds that day. *Id.* He also noted that Mary came to the appointment with a child in a stroller, and she could bend and twist with relative ease to care for the child. *Id.* Mary continued to complain of back and neck pain later in April. She said her pain would go up to a nine-out-of-ten and that a sharp, burning pain radiated into her right anterior thigh if she stood longer than three minutes. R. 445. Exam findings were normal. R. 446. The next day, Mary reported acupuncture was not effective, and an exam revealed some discomfort to palpation in the left and right lumbar areas, but she had normal gait and her cervical and thoracic exams were normal. R. 457. Eileen Greenwald, M.D., assessed lumbar strain, noted that Mary objectively "seem[ed] a little better today," but subjectively she "state[d] she is about the same," and recommended trying a short chiropractic course. *Id.*

In May, Mary reported "marginal" pain relief from a thoracic ESI, but her upper back pain continued, and she complained of lower- and mid-back pain. R. 559. Exam revealed

positive straight leg raising test on the right, "marked" tenderness in the midline and paravertebral areas at L4-5, L5-S1, and L1-2, and "some" tenderness in the midline and right paravertebral area at approximately T5-6, and she "complain[ed] of increased mid/low back pain with flexion of her lumbosacral spine." R. 560. Dr. Yousufuddin ordered lumbar ESI, started her on a Lidoderm patch, increased her Norco, and refilled her Mobic. *Id.*

In June, Mary rated her low back pain a four-out-of-ten but said it could get up to a nine-out-of-ten by the end of the day, and she rated her mid-back pain a two-out-of-ten. R. 555. It was noted that her surgeon had recently recommended a spinal cord stimulator trial. *Id.* On exam, she displayed decreased sensation to soft touch on the inner, posterior and outer aspect of her right leg with the inner aspect being most numb, positive straight leg raising test on the right, tenderness in the midline and right paravertebral areas at L4-5, and "mild" tenderness in the midline and right paravertebral area at L1-2, and she "complain[ed] of right-sided low back pain with flexion of her lumbosacral spine." R. 556. Dr. Yousufuddin ordered a spinal cord stimulator trial and refilled her Norco. *Id.*

In July, Mary complained of low back pain radiating to her feet, more frequent on the right side. R. 553. She said her pain was a four-out-of-ten in the mornings and could get up to a nine-out-of-ten by the end of the day, she had numbness in her lower extremities, and she "may at times have mid back pain." *Id.* Examination revealed decreased sensation to soft touch on the inner aspect of her right leg and the inner and outer aspects of her left leg, positive straight leg raising test on the right, tenderness in the midline and right paravertebral area at L4-5 and L1-2, and tenderness present in the left paravertebral area at L5-S1, and she "complain[ed] of low back pain with flexion of her lumbosacral spine." R. 554. Dr. Yousufuddin ordered lumbar ESI, refilled her Norco, and prescribed Ultram. *Id.*

In late August, Mary complained of right sided mid back pain and right thigh pain, which she rated as a five-out-of-ten. R. 548. On exam, she displayed decreased sensation to soft touch over the right flank and the whole of the right lower extremity, positive straight leg raising test on the right, tenderness at the midline and right paravertebral areas at L1-2, and tenderness of the right paravertebral areas at L3-4 and L4-5, and she "complain[ed] of low back pain with flexion of her lumbosacral spine." R. 549. In September, Mary underwent a spinal cord stimulator placement and began her trial. R. 546.

A thoracic MRI performed in December revealed multilevel degenerative changes in the lower thoracic spine with mild central canal stenosis and no cord compression or cord signal abnormality, as well as straightening of the thoracic kyphosis. R. 505. A few days later, Mary said she was "very happy" with the results of her spinal cord stimulator trial, and she underwent "T9 and T8 midline laminectomies for [a] dorsal column stimulator placement with right buttock implantable pulse generator placement." R. 531; *see also* R. 493 (reporting 70% relief of her leg pain with spinal cord stimulator trial) (Nov. 5, 2015), 532 (operative report) (Dec. 7, 2015).

In January 2016, Mary's spinal cord stimulator was adjusted. Exam findings were normal, and she was "doing well from a neurosurgical perspective." R. 499; *see also* R. 542–43. In February, Mary reported two-out-of-ten low back pain, but she continued to complain of chronic neck pain, radiating to both upper extremities, worse on the right. R. 539. On examination, Mary displayed "marked" tenderness in the midline and bilateral paravertebral areas at C6-7, with the right paravertebral area more tender than the left, and she "complain[ed] of increased neck pain with both flexion and extension of her cervical spine." R. 540. Dr. Yousufuddin scheduled cervical ESI, refilled her Tramadol, and noted that her spinal cord stimulator was helping her low back pain "to a substantial extent." *Id.*

Mary presented to the Hershey Medical Center in March, reporting that the stimulator was "only helping her pain about 40% and not enough to really improve things for her." R. 1198. She asked whether she was a potential candidate for a lumbar fusion, but Dr. Sather said she likely did not have a structural problem that would benefit from surgery. *Id.* He ordered X-rays and advised Mary to continue with the spinal cord stimulator for a few months and reevaluate at that time. R. 1198–99. Later in March, an examination revealed decreased sensation over the base of her neck and her upper back bilaterally, "marked" tenderness in the midline and bilateral paravertebral areas at C7-T1, with the right paravertebral area more tender than the left, and "marked" tenderness in the midline and bilateral paravertebral areas at C4-5 and C5-6. R. 706. Mary "complain[ed] of increased neck pain with both flexion and extension of her cervical spine." *Id.*

In April, Mary continued to have right-sided neck pain associated with headaches. R. 1052. Examination revealed "marked" tenderness in the midline and right paravertebral areas at C3, C4, and C5 and tenderness in the midline and left paravertebral area at C7-T1, and she "complain[ed] of increased right sided upper neck pain with extension and twisting of her neck to the right side. R. 1053.

On May 3, 2016, Mary complained of balance issues, ongoing headaches, generalized fatigue, numbness and tingling in her lower extremity, and she had eight-out-of-ten pain throughout her lumbar spine. R. 1409. She said her symptoms were present all the time, but were exacerbated by five-to-ten minutes of standing or walking. *Id.* On exam, she had generalized tenderness at multiple trigger points throughout her thoracolumbar spine, restricted ROM in her lumbar spine, and steady gait. *Id.*

B.    *Relevant Opinion Evidence*

14

In August 2014, PA Van Grouw, wrote a "To Whom It May Concern" letter recommending that Mary not work more than four hours per day and not lift more than twenty pounds at a time. R. 438. That same day, PA Van Grouw filled out an RFC Questionnaire form. *See* R. 688–90. He found that Mary's impairments would frequently interfere with the attention and concentration required to perform simple, work-related tasks and that she needed to recline or lie down during the workday in excess of typical breaks. R. 688. Mary could sit for sixty minutes and stand/walk for sixty minutes, at a time; and she could sit for eight hours and walk for four hours total in an eight-hour workday. *Id.* Mary required a job that permitted shifting positions at will from sitting, standing or walking, and she needed a fifteen-minute break every two hours. *Id.* Further, she could frequently lift/carry less than ten pounds, occasionally lift/carry between ten and twenty pounds, and never carry fifty pounds or more. R. 689. She could use her hands to grasp, turn, or twist objects for 50% of the workday, could use her fingers for fine manipulation for 75% of the workday, could use her arms for reaching 25% of the workday, and would miss more than four days of work per month. *Id.* Mary had these limitations beginning on May 25, 2012. R. 690. PA Van Grouw wrote another "To Whom It May Concern" letter in February 2015, wherein he conveyed Mary's medical history and stated that her neck pain became severe if she held her head up for more than thirty minutes without resting her head, which she could not do "even with desk work." R. 436.

In September 2020, Dr. Fuchs filled out a form titled, "Medical Statement of Ability to do Work-Related Activities (Physical)." *See* R. 1568–73. Dr. Fuchs opined that Mary could lift/carry up to ten pounds occasionally and never lift more than ten pounds, R. 1568, could sit for one hour and stand/walk for forty-five minutes at one time without interruption, R. 1569, and could sit for six hours and stand/walk for two hours total in an eight-hour day, *id.* Further, she

could occasionally reach overhead with both hands; could frequently handle, finger, feel, push/pull, or perform other reaching; and could occasionally operate foot controls with either foot. R. 1570. Mary could occasionally climb stairs/ramps, balance, stoop, kneel, and crouch; never climb ladders/scaffolds or crawl; tolerate occasional exposure to moving mechanical parts, operating a motor vehicle, humidity and wetness, extreme cold and extreme heat; and never tolerate exposure to unprotected heights or vibrations. R. 1571–72. She could adequately perform her activities of daily living. R. 1573. Dr. Fuchs also filled out an interrogatory form regarding Mary's physical impairments. *See* R. 1575–77. He based his opinion on medical records spanning from January 2012 to July 2020, R. 1575, and he found that Mary's condition medically equaled Listing 1.04 as of October 19, 2016, R. 1576. Dr. Fuchs noted that he "did fill out an ability to work but those decisions are quite tentative. In view of all the procedures she has undergone, her abilities are quite limited and tentative." *Id.* In support of his opinions, he cited Mary's cervical fusions in 1997 and 2000; her "redo" thoracic, lumbar, and sacral scoliosis operations in 2012 and 2018; and her obesity. R. 1575.

2.     *The ALJ's Decision*

       ALJ Treblin found that Mary had "severe" impairments of neck disorder, back disorder, fibromyalgia, obesity, depressive disorder, and panic disorder. R. 723. In assessing Mary's light RFC, ALJ Treblin evaluated the medical opinion evidence of record.

       Relevant to Mary's arguments on appeal, ALJ Treblin acknowledged the statements and opinions contained in PA Van Grouw's August 2014 and February 2015 "To Whom It May Concern" letters. R. 730. He afforded these opinions "minimal weight," finding they were not consistent with PA Van Grouw's own exam findings or the medical records as a whole. *Id.* He did not, however, evaluate PA Van Grouw's RFC Questionnaire.

Turning to the opinions of Dr. Fuchs, ALJ Treblin observed that his finding that Mary met a Listing on October 19, 2016, was not applicable to the relevant period, which covered January 1, 2013, to May 4, 2016. *Id.* He also noted that Dr. Fuchs "render[ed] an opinion that [Mary] can perform sedentary work," but did not state when it applied. *Id.* Nonetheless, ALJ Treblin found that the opinion appeared to cover "the period prior to his finding [Mary] equal[ed] the listing of impairments on October 19, 2016." *Id.* He then evaluated that portion of the opinion and found it was "supported and does not provide a basis upon which to find [Mary] disabled during the timeframe" under adjudication. *Id.* ALJ Treblin found that Mary "ha[d] a greater residual functional capacity based upon the evidence discussed in [his] decision," and he afforded Dr. Fuchs's opinion "some weight." *Id.*

ALJ Treblin concluded that Mary retained the RFC to perform a range of "light" work. R. 725. Specifically, she needed to be able to alternate sitting/standing every twenty minutes or as needed; could never climb ladders, ropes, or scaffolds; could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl, and perform rotation, flexion, and extension of the neck; could never push or pull or operate foot controls with the bilateral lower extremities; and needed to avoid all exposure to cold temperatures and workplace hazards. R. 725–26.

*3.      Analysis*

Mary's arguments challenge the ALJ's assessment of her RFC. *See generally* Pl.'s Br. 11–18. A claimant's RFC is her "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite his medical impairments and symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). It is a factual finding "made by the [ALJ] based on all the relevant evidence in the case record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011), and it should reflect

specific, credibly established "restrictions caused by medical impairments and their related symptoms" that affect the claimant's "capacity to do work-related physical and mental activities," SSR 96-8p, 1996 WL 374184, at *1, *2. *See Mascio v. Colvin*, 780 F.3d 632, 637–40 (4th Cir. 2015); *Reece v. Colvin*, 7:14cv428, 2016 WL 658999, at *6–7 (W.D. Va. Jan. 25, 2016), *adopted by* 2016 WL 649889 (W.D. Va. Feb. 17, 2016).

In determining a claimant's RFC, the ALJ will evaluate the medical opinion evidence of record. For claims filed prior to March 27, 2017, "medical opinions" are statements from "acceptable medical sources," such as physicians, that reflect the source's judgments about the nature and severity of the claimant's impairment, including her symptoms, diagnosis and prognosis, functional limitations, and remaining abilities. 20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1). The ALJ must adequately explain the weight afforded to each medical opinion in the claimant's record, taking into account relevant factors such as the nature and extent of the physician's treatment relationship with the claimant; how well the physician explained or supported the opinion; the opinion's consistency with the record as a whole; and whether the opinion pertains to the physician's area of specialty. *Id.* §§ 404.1527(c), 416.927(c). A reviewing court "must defer to the ALJ's assignments of weight" among differing medical opinions unless his underlying findings or rationale "are not supported by substantial evidence" in the record. *Dunn v. Colvin*, 607 F. App'x 264, 271 (4th Cir. 2015); *see also Sharp v. Colvin*, 660 F. App'x 251, 257 (4th Cir. 2016).

ALJ Treblin's analysis of Dr. Fuchs's opinion does not meet these minimum standards. First, the ALJ failed to sufficiently explain his finding regarding the period covered by Dr. Fuchs's opinion that Mary was limited to sedentary work. Although ALJ Treblin found this opinion appeared to apply to "the period prior to his finding the claimant equaling the listing of

impairments on October 19, 2016," he did not specify whether he determined that Dr. Fuchs's medical opinion applied to the relevant period—from January 1, 2013, through May 4, 2016—or outside of the period under adjudication—from May 5, 2016, through October 18, 2016.

Next, ALJ Treblin found that Dr. Fuchs's opinion was "supported," but nonetheless found that it did "not provide a basis upon which to find the claimant disabled during the timeframe being adjudicated in this decision." *Id.* ALJ Treblin did not, however, identify what evidence he relied upon to reach this conclusion or provide an adequate explanation for the conclusion. Seemingly contradicting the finding that Dr. Fuchs's opinion was supported, the ALJ concluded that Mary "ha[d] a greater residual functional capacity based upon the evidence discussed in this decision" and gave the opinion only "some weight." R. 731. Moreover, the ALJ's sole stated basis for diverging from Dr. Fuchs's opinion rests upon his citation to the entirety of "the evidence discussed in [his] decision." *See id.* That explanation falls short of the requirements of 20 C.F.R. §§ 404.1527(c), 416.927(c), and precludes meaningful review. *See Monroe v. Colvin*, 826 F.3d 176, 191 (4th Cir. 2016) ("The ALJ stated that he gave that opinion only 'limited weight' based on a determination that 'the objective evidence or the claimant's treatment history did not support the consultative examiner's findings.' However, the ALJ did not specify what 'objective evidence' or what aspects of Monroe's 'treatment history' he was referring to. As such, the analysis is incomplete and precludes meaningful review." (internal citations omitted)).

Furthermore, the medical evidence in this case is conflicting, *compare* R. 398–99 (unremarkable exam) (Feb. 2013), R. 331 ("slightly to moderately" decreased neck ROM with otherwise normal findings) (Feb. 2014), 442 (unremarkable exam) (Apr. 2015), R. 499 (unremarkable exam) (Jan. 2016), *with* R. 578 (decreased sensory response to soft touch on the

outer aspect of her right leg, positive straight leg raising test on the right, "marked" tenderness in the midline and right paravertebral area at L5-S1) (Sept. 2014), R. 566 (decreased sensation in the inner aspect of her right leg, positive straight leg raising test on the right, "marked" tenderness in the midline and right paravertebral areas at C6-7, tenderness at the midline and right paravertebral area at L4-5) (Feb. 2015), R. 549 (decreased sensation to soft touch over the right flank and the whole of the right lower extremity, positive straight leg raising test on the right, tenderness at the midline and right paravertebral areas at L1-2, tenderness of the right paravertebral areas at L3-4 and L4-5) (Aug. 2015), R. 706 (decreased sensation over the base of her neck and her upper back bilaterally, "marked" tenderness in the midline and bilateral paravertebral areas at C7-T1, with the right paravertebral area more tender than the left, "marked" tenderness in the midline and bilateral paravertebral areas at C4-5 and C5-6) (Mar. 2016), and Mary underwent several procedures, received numerous injections, and had a spinal cord stimulator implanted during the relevant period. Considering this complex record, the ALJ was required to weigh the conflicting evidence and explain—based on that evidence—how he concluded that Dr. Fuchs's opinion did not support a finding of greater limitations during the relevant period than the ALJ assessed. *See DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983) ("It may be, of course, as the Secretary suggests on appeal, that the ALJ considered all of these factors and proposed to himself cogent reasons for disregarding them. However, on this record we cannot so determine."); *see also Mascio*, 780 F.3d at 637 ("Because we are left to guess about how the ALJ arrived at his conclusions on Mascio's ability to perform relevant functions and indeed, remain uncertain as to what the ALJ intended, remand is necessary."). In neglecting to provide such an explanation, ALJ Treblin failed to build an "accurate and logical bridge" from the evidence to his conclusion to largely disregard to Dr. Fuchs's opinion that Mary

was limited to sedentary work. Accordingly, I cannot find that substantial evidence supports the ALJ's decision, and remand is warranted.

Lastly, Mary argues that the ALJ erred by failing to consider PA Van Grouw's RFC Questionnaire, which she contends violated the remand order issued by the Appeals Council. Pl.'s Br. 12–13; *see also* R. 688–90. The Appeals Council's remand order directed that a new ALJ conduct "further proceedings consistent with the order of the court." R. 833. District Judge Kane's order adopted Magistrate Judge Cohn's report and recommendation, R. 810–11, which found that although ALJ Riley had assessed PA Van Grouw's RFC Questionnaire, he had erroneously rejected it without noting any other medical opinions that contradicted PA Van Grouw's findings. R. 817. Thus, ALJ Riley "relied on speculation or lay interpretation of medical evidence to reach the conclusion regarding Plaintiff's RFC," R. 818.

Despite the district court's remand order and instructions, ALJ Treblin completely failed to discuss, or even cite to, PA Van Grouw's RFC Questionnaire. *See* R. 730. The ALJ's omission violated the district court's remand order, R. 833, and failed to consider all relevant evidence in the record, *See Miles v. Colvin*, No. 7:15cv550, 2017 WL 835250, at *5 (W.D. Va. Mar. 2, 2017) ("the ALJ has a duty to consider all of the evidence in a claimant's case record, including evidence provided from medical sources who are not 'acceptable medical sources' such as a physician's assistant."); SSR 06-03p, 2006 WL 2329939, at *4 ("Although 20 C.F.R. 404.1527 . . . do[es] not address explicitly how to evaluate evidence (including opinions) from 'other sources,' they do require consideration of such evidence when evaluating an 'acceptable medical source's' opinion."). On remand, the Commissioner shall consider PA Van Grouw's opinions, including the RFC Questionnaire, R. 688–90, consistent with applicable law.

IV. Conclusion

21

For the foregoing reasons, the Court will **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 19, **REVERSE** the Commissioner's final decision, **REMAND** the matter for further proceedings under the fourth sentence of 42 U.S.C. § 405 (g), and **DISMISS** this case from the Court's active docket.

A separate Order shall enter.

ENTER: March 31, 2022

Joel C. Hoppe
United States Magistrate Judge

22